July 16, 2026

**Supreme Court**

No. 2023-308-M.P.
(PM 17-4915)

(Concurrence begins on Page 16)

|                      |   |
|----------------------|---|
| Terrel Barros        | : |
|                      |   |
| v.                   | : |
|                      |   |
| State of Rhode Island. | : |

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Terrel Barros          :

v.                     :

State of Rhode Island.          :

Present:  Suttell, C.J., Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Long, for the Court.**  This case came before the Supreme Court pursuant to a writ of certiorari for which the state petitioned, seeking review of a Superior Court judgment granting Terrel Barros's (Mr. Barros) application for postconviction relief.  Mr. Barros filed his application for postconviction relief alleging actual innocence and a number of constitutional violations and other infirmities with his conviction.  The hearing justice, after holding a six-day hearing, granted Mr. Barros's application for postconviction relief and vacated his conviction.  Before this Court, the state argues that the hearing justice erred in sustaining Mr. Barros's claims and granting his application for postconviction relief.

- 1 -

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## Facts and Procedural History

We glean the underlying facts in this case from *State v. Barros*, 148 A.3d 168 (R.I. 2016), in which this Court affirmed Mr. Barros's conviction for first-degree murder, a number of firearm charges, and felony assault; facts from the postconviction-relief proceedings are taken from the hearing justice's decision and the record of those proceedings. *Barros*, 148 A.3d at 169-70.

On August 25, 2012, Jamal Cruz (Mr. Cruz) and Rokiem Henley (Mr. Henley), two long-time friends, went to Monet Lounge in Providence to celebrate their friend's birthday. *Barros*, 148 A.3d at 170. The two men and their friends spent the evening in the club's VIP area until 2 a.m., when the club closed. *Id.* As Mr. Cruz and Mr. Henley left the club, Mr. Cruz and two men, Mr. Barros and Stephen Bodden (Mr. Bodden), engaged in a "little verbal disagreement." *Id.* No physical altercation occurred; Mr. Cruz then proceeded to collect his car, and Mr. Henley walked to the car about ten to fifteen minutes later. *Id.* As Mr. Henley walked to Mr. Cruz's car, he observed Mr. Bodden approach Mr. Cruz and heard him say,

"What's up with that shit that happened in the club?" *Id.* Mr. Henley then heard gunshots and realized he had been shot in the leg. *Id.*

Patrolmen Daniel Sirignano and Michael Pattie of the Providence Police Department, who had been working a police detail at Monet Lounge that night, heard the gunshots and responded immediately. *Barros*, 148 A.3d at 170. Officer Sirignano arrived first, within seconds, and saw Mr. Bodden and Mr. Barros get into a car; he also observed that Mr. Bodden had a firearm that he was trying to hide. *Id.* Officer Pattie arrived "moments later," and together the officers arrested and handcuffed both men. *Id.* Mr. Cruz, who had been shot in the stomach, died shortly thereafter from his injuries. *Id.*

Mr. Barros was charged in an eight-count indictment with murder, assault with a dangerous weapon, and a number of firearm charges. Mr. Bodden was charged with receiving stolen goods, carrying a pistol without a license, and a common law felony. During an eight-day jury trial in July 2013, the state presented evidence that Mr. Cruz had identified Mr. Barros as his shooter before he succumbed to his injuries, as well as an eyewitness, Gregory Zorabedian (Mr. Zorabedian), a parking lot attendant, who testified that he saw Mr. Barros with a gun in his hand.[1]

---

[1] As the hearing justice would later note in his postconviction-relief decision, Mr. Zorabedian did not come forward until "the eve of trial" to say that he had seen a gun in Mr. Barros's hand after the shots were fired. He had previously testified in a pretrial hearing that he had not seen Mr. Barros with a gun.

*See Barros*, 148 A.3d at 170. Mr. Barros's argument at trial was that it was Mr. Bodden who had shot Mr. Cruz and Mr. Henley. *Id.* Officer Pattie testified that Mr. Bodden, when he was arrested, said to him, "It's me. It's all me. It's all mine." *Id.* Although Mr. Barros's counsel tried to call Mr. Bodden at trial, he invoked his Fifth Amendment privilege not to testify. *Id.* at 171.

Mr. Barros was found guilty on six counts; he was sentenced to two consecutive life sentences for first-degree murder and using a firearm during a violent crime, three consecutive ten-year terms for three firearm crimes, and one concurrent twenty-year term for felony assault. *Barros*, 148 A.3d at 169-70. He thereafter filed an application for postconviction relief alleging ineffective assistance of counsel, judicial misconduct, prosecutorial misconduct, a due process violation, actual innocence, and an error in the jury instructions. In support of his claim that newly discovered evidence warranted a new trial, Mr. Barros called a number of witnesses who did not testify at trial; he also argued that his trial counsel was ineffective in failing to obtain one of those witness's presence at trial. Mr. Barros also presented testimony regarding the DNA evidence and gun powder residue.

Gloria Parajon (Ms. Parajon), a cousin of Mr. Bodden, was one of the witnesses Mr. Barros called during the hearing. She described that she and Mr. Bodden grew up together and were very close until he was murdered in October 2017. Indeed, Mr. Bodden was living with her in 2017 at the time of his death. Ms.

Parajon explained that a few days after the shooting, she and a family member picked up Mr. Bodden from the Adult Correctional Institutions (ACI) and took him back to her father's house. She also recalled that she had expected at the time that Mr. Bodden would be charged with Mr. Cruz's murder even before he confided in her: "I thought that he did it [given] * * * his [criminal] record and knowing that he was a violent person and that he * * * carried guns * * *."

When they did discuss what transpired on the night of the shooting once they arrived back at her father's house, Ms. Parajon testified that Mr. Bodden told her that he intended to scare away "the guys" by shooting in the air and that when they were not deterred, he shot at them. She then testified that "he said that that didn't do anything, so the guy got closer to him and he shot the guy." She stated that Mr. Bodden had told her that Mr. Barros was at the "wrong place at the wrong time * * *."

Ms. Parajon also testified that she had between five and ten conversations with Mr. Bodden during the five years between the time that she picked him up from the ACI and his death in which he admitted to shooting Mr. Cruz and Mr. Henley. She also noted Mr. Bodden's "love" of guns and that he always carried a gun with him. Ms. Parajon also explained that although she had not been threatened by anyone, she did not come forward at the time of Mr. Barros's trial because her family told her

not to involve herself. It was only after Mr. Bodden's murder that she reached out to Mr. Barros's mother on Facebook in July 2020.

In rendering his decision, the hearing justice found that Ms. "Parajon's testimony [was] not merely cumulative or impeaching, and her testimony [was] of a kind that could change the verdict at a new trial since it offers new and exculpatory evidence * * * that Bodden admitted to being the shooter * * *." He noted that Ms. Parajon's testimony would have added and given context to Mr. Bodden's statement to police on the night of the shooting that "[i]t's me. It's all me. It's all mine." Based in part on his conclusion that Ms. Parajon's testimony constituted newly discovered evidence, the hearing justice granted Mr. Barros's petition for postconviction relief.[2] He therefore vacated Mr. Barros's conviction and concluded that he was entitled to a new trial.

**Standard of Review**

Under G.L. 1956 § 10-9.1-1, "the remedy of postconviction relief is available to any person who has been convicted of a crime and who thereafter alleges either that the conviction violated the applicant's constitutional rights or that the existence of newly discovered material facts requires vacation of the conviction in the interest

---

[2] The hearing justice also granted postconviction relief on Mr. Barros's claims of ineffective assistance of trial counsel and violation of his Fourteenth Amendment due process rights due to the state's use of false or misleading DNA evidence at trial. He rejected the testimony of four of the five individuals that Mr. Barros put forth as newly discovered evidence and denied relief on his actual innocence claim.

of justice." *DeCiantis v. State*, 24 A.3d 557, 569 (R.I. 2011) (quoting *Page v. State*, 995 A.2d 934, 942 (R.I. 2010)). The applicant for postconviction relief must prove by a preponderance of evidence that such relief is warranted in their case. *See Brown v. State*, 32 A.3d 901, 907 (R.I. 2011). Our review of an application of postconviction relief on certiorari "is limited to an examination of the record to determine if an error of law has been committed." *LeFebvre v. State*, 313 A.3d 1156, 1162 (R.I. 2024) (quoting *Atryzek v. State*, 268 A.3d 37, 41 (R.I. 2022)). "In addition to examining the record for judicial error, we inspect the record to discern if there is any legally competent evidence to support the findings of the hearing justice below." *Id.* (quoting *Atryzek*, 268 A.3d at 41). "This Court will not disturb a trial justice's factual findings made on an application for post-conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence in arriving at those findings." *Chapdelaine v. State*, 32 A.3d 937, 941 (R.I. 2011) (quoting *Gordon v. State*, 18 A.3d 467, 473 (R.I. 2011)).

**Analysis**

The state contends that the hearing justice erred in granting Mr. Barros's application for postconviction relief based on newly discovered evidence (the testimony of Ms. Parajon) because this evidence would not have been admissible at trial. Specifically, the state avers that Ms. Parajon's testimony about Mr. Bodden's confession to the shooting does not satisfy the requirements of Rule 804(b)(3) of the

Rhode Island Rules of Evidence, the statement against interest exception. We conclude that the hearing justice did not err in finding that Ms. Parajon's testimony would have been admissible at trial and therefore decline to disturb his grant of postconviction relief on this issue.

A claim of newly discovered evidence raised in a postconviction-relief application is reviewed under the same standard we apply for a newly discovered evidence claim raised by a defendant in a motion for a new trial. *See Graham v. State*, 229 A.3d 63, 69 (R.I. 2020). The test by which a court reviews a claim for newly discovered evidence consists of two prongs, the first of which requires an applicant to establish four factors:

> "(a) the evidence is newly discovered or available only since trial; (b) the evidence was not discoverable prior to trial despite the exercise of due diligence; (c) the evidence is not merely cumulative or impeaching but rather is material to the issue upon which it is admissible; and (d) the evidence is of a kind which would probably change the verdict at trial." *Id.* at 69 (quoting *Rice v. State*, 38 A.3d 9, 15 n.8 (R.I. 2012)).

If an applicant satisfies the four factors of this first prong, then the hearing justice must determine whether the newly discovered evidence is "credible enough to warrant relief," that is, whether they should grant a new trial. *Fontaine v. State*, 602 A.2d 521, 524 (R.I. 1992).

The state acknowledges that Ms. Parajon's testimony was not available to Mr. Barros at the time of his trial and that it was not discoverable through the exercise

of due diligence.  Rather, it contends that Ms. Parajon would not have been able to testify about what Mr. Bodden told her because his statement was not admissible as a statement against penal interest under Rule 804(b)(3).  The state argues that Mr. Bodden's statement was not inculpatory, but rather established that he shot Mr. Cruz and Mr. Henley in self-defense and therefore could not qualify as a statement against penal interest because it "minimized his culpability and seemingly qualifies as legally exculpatory."  It further avers that the statement was not properly corroborated.

Rule 804(b)(3) reads in relevant part:

> "*Statement Against Interest.* A statement which was at the time of its making * * * so far tended to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true.  A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." R.I. R. Evid. 804(b)(3).

"The rationale for [Rule 804(b)(3)] is that people are not likely to make statements that are damaging to themselves unless they believe them to be true." *State v. Lynch*, 854 A.2d 1022, 1038 (R.I. 2004) (quoting Rule 804(b)(3) Advisory Committee's Note).  This Court has highlighted three factors to consider in determining the trustworthiness of statements made against the declarant's penal interest: "first, the timing of the declaration and the party to whom the declaration was made; second,

the existence of corroborating evidence; and third, the extent to which the statement is truly against the declarant's penal interest." *State v. Firth*, 708 A.2d 526, 531 (R.I. 1998).

In his decision granting relief, the hearing justice noted that the state did not dispute that Ms. Parajon's testimony that Mr. Bodden admitted to being the shooter at Monet Lounge was evidence that was unknown at the time of trial and was not discoverable through the exercise of due diligence because neither Mr. Barros nor his defense counsel would have been aware of Ms. Parajon's existence at the time of trial. He then found that Ms. Parajon's testimony was "not merely cumulative or impeaching, and * * * [was] of a kind that could change the verdict at a new trial since it offers new and exculpatory evidence." He highlighted specifically that "[t]he testimony would add to and give context to Bodden's statement that, 'It's me. It's all me. It's all mine.'"

Turning to the admissibility of Ms. Parajon's testimony, the hearing justice then found that Mr. Bodden's confession was "clear[ly]" against his penal interest, given that he had just been released from the ACI and because the central question in the days following the shooting was "whether Bodden or Barros was the shooter." The hearing justice further found that the corroborating circumstances supported admission of his confession—specifically because Mr. Bodden first confessed to Ms. Parajon immediately after being released on bail and because "it was not surprising

to her in light of her knowledge of his character and reputation." Additionally, the hearing justice highlighted that the confession was made within days of his statement to Officer Pattie that "[i]t's me. It's all me. It's all mine." Although the hearing justice noted that it was "clearly concerning that Parajon did not come forward for years, until her cousin was killed," he emphasized that her choice to reach out to Mr. Barros's mother following Mr. Bodden's death out of her own volition offered further corroboration of her testimony.

Having found that this evidence satisfied the four factors of the first prong under the newly discovered evidence test, the hearing justice then turned to the evidence's credibility. He found that it was credible because "Parajon was unknown to Barros, coupled with her familial relation to Bodden, and * * * [because] she reached out to Barros's mother without any prompt * * *." The hearing justice therefore concluded that Ms. Parajon's testimony constituted newly discovered evidence.

On appeal, the state disputes both the admissibility of the evidence and its corroboration. However, the hearing justice correctly stated the standard for granting postconviction relief based upon a newly discovered evidence claim and diligently applied it in his analysis; he committed neither an error of law, nor did he overlook or misconceive material evidence in arriving at his factual findings. *See Atryzek*, 268 A.3d at 41. As such, we see no reason to overturn his granting of

- 11 -

postconviction relief regarding the newly discovered evidence contained within Ms. Parajon's testimony.

The hearing justice found conclusively that the statement was against Mr. Bodden's penal interest because he "had just been released on bail after the shooting and the issue all along was whether Bodden or Barros was the shooter." The state cites several cases from other jurisdictions in which courts have held that claims of self-defense do not qualify as statements against penal interest. However, this Court has never made such a pronouncement. Thus, even assuming *arguendo* that Mr. Bodden's statement was made in self-defense, the hearing justice's conclusion that the statement qualified as a statement against penal interest would not amount to an error of law or a clearly erroneous evidentiary ruling warranting reversal of the granting of postconviction relief.

Moreover, we have held that the test for whether a statement is against penal interest under Rule 804(b)(3) "is not whether a declarant's statement could have subjected him to civil or criminal liability; rather it is whether the statement was sufficiently against the declarant's interest that a reasonable person in declarant's position would not have made the statement unless he believed it to be true." *Lynch*, 854 A.2d at 1038. The state poses a false dichotomy between statements against penal interest and statements made in self-defense, but this misstates the relevant test. The key inquiry for admissibility of a hearsay statement is the reliability of the

- 12 -

statement, and for the purposes of Rule 804(b)(3), "reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994). The state offers no compelling explanation as to why Mr. Bodden would have told Ms. Parajon on numerous occasions over a number of years that he had committed the shooting if he had not. As such, we cannot say the hearing justice acted improperly in his finding that the statement was against penal interest.

The state avers that the hearing justice further erred in finding that Mr. Bodden's statement was sufficiently corroborated based only on the fact that he confessed to a family member and the timing of the confession. It also contests that the confession was inconsistent with the other evidence in this case because (1) "it is not clear that Bodden was admitting to shooting Cruz" in his statement to Officer Pattie that "[i]t's all me" and "not merely taking responsibility for the gun that the officers were seizing"; (2) no one else testified to the warning shot; and (3) no one else testified that he tried to confess to the murder but that the police ignored him. All of these arguments are unavailing.

First, although it is true that we have rejected the notion that "a statement made to a close family member, by itself, indicates trustworthiness," *Firth*, 708 A.2d at 531, the hearing justice did not rely solely on the relationship between Ms. Parajon and Mr. Bodden in finding that the statement was sufficiently corroborated. Rather,

- 13 -

he also noted the timing of the confession—immediately after Mr. Bodden's release from the ACI, which would have been the first opportunity he had to speak with a close confidant in an environment free from surveillance. He additionally highlighted that the confession was "not surprising to [Ms. Parajon] in light of her knowledge of [Mr. Bodden's] character and reputation" as well as its temporal proximity to his statement to Officer Pattie that "[i]t's me. It's all me. It's all mine." *Cf. id.* (finding a statement made three and a half years after the incident to be unreliable in part because of the amount of time that had passed). The hearing justice therefore clearly laid out the factors that he had considered in finding the statement to be sufficiently corroborated, and we cannot detect any error in his analysis.

Further, the state's contention that Mr. Bodden's confession is inconsistent with the other evidence in this case similarly fails. To argue, as the state does, that Mr. Bodden's statement to Officer Pattie could have merely been him claiming the gun as his own strains credulity and distorts semantics. We decline to credit this interpretation of this statement as definitive when it is, at minimum, equally plausible that Mr. Bodden meant this statement as a confession to the shooting. Especially when one considers the timing of this statement—mere moments after the shooting, with Officer Pattie running over to the car after hearing gunshots—the hearing justice's interpretation of this statement as inculpatory was eminently reasonable.

The state also suggests that no one corroborated Mr. Bodden's retelling to Ms. Parajon that he first fired a warning shot, but Mr. Zorabedian testified that he heard two or three shots, which the state itself noted in its brief. While Mr. Zorabedian was not cross-examined as to whether one of those shots could have been a warning shot, since Mr. Bodden's account was not known at trial, we cannot agree that "[t]here was no testimony or other evidence that the gunman fired a warning shot before fatally shooting Cruz." Additionally, the state's argument that no one corroborated Mr. Bodden's assertion that he tried to confess to police but that they ignored him is directly contradicted by the way the hearing justice interpreted the statement that "[i]t's me. It's all me. It's all mine." We cannot conclude that the hearing justice clearly erred in finding that this statement was Mr. Bodden's way of contemporaneously confessing to the shooting or that this statement provided corroboration for his later confession to Ms. Parajon. Therefore, we disagree with the state's assertion that Mr. Bodden's account of an attempted confession to the police was uncorroborated. In short, the state presents no credible argument as to why or how the hearing justice erred. We therefore decline to upset his granting of postconviction relief based on the newly discovered evidence.

Because we conclude that the hearing justice properly granted Mr. Barros's application for postconviction relief on the newly discovered evidence issue, we need not consider the state's other assignments of error. We do, however, celebrate

the advancements in the understanding of DNA science since the time of Mr. Barros's first trial. We encourage all parties to learn more about these advancements and implications for this case if the state ultimately decides to retry Mr. Barros.

## Conclusion

For the reasons herein, we affirm the judgment of the Superior Court granting Mr. Barros's application for postconviction relief. We therefore remand the record of the case to the Superior Court.

Justice Goldberg did not participate.

**Justice Robinson, concurring in the result.** I am pleased to concur in the result reached by the majority in this troubling case. I believe that, taking into account the totality of all the circumstances before us, it is not unreasonable for this Court to have decided that Mr. Barros should be granted a new trial, although I have reached that conclusion in a *dubitante* frame of mind.

I must state that I am completely unpersuaded by the majority's reliance on the newly discovered evidence concept as the rationale for granting a new trial. I am unconvinced that the criteria for admitting newly discovered evidence were met in this case.

What has persuaded me to concur in the result reached by the majority, however, is the fact that I am troubled by the overall effect that some of the testimony and some of the questioning and argument relative to the DNA evidence may have had on the jury. I wish to be clear: I do not contend that any witness for the prosecution or the prosecution itself knowingly engaged in any false or misleading conduct. However, there is such a lack of clarity about what the jury was given to understand concerning what the DNA evidence did and did not indicate that I believe that the grant of a new trial is appropriate in this very close case.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Terrel Barros v. State of Rhode Island. |
| **Case Number** | No. 2023-308-M.P.<br>(PM-17-4915) |
| **Date Opinion Filed** | July 16, 2026 |
| **Justices** | Suttell, C.J., Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Luis Matos |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General |
| | For Respondent:<br><br>Robert Kando, Esq. |